# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

ANDREA OLSEN,              )
                                    )
              Plaintiff,     )
                                    )
v.                               ) Case No. 10-4221-CV-C-FJG
                                    )
CAPITAL REGION MEDICAL CENTER, et al., )
                                    )
              Defendants.    )

## ORDER

Currently pending before the Court is defendant's Motion for Summary Judgment (Doc. # 30); plaintiff's Motion in Limine (Doc. # 64) and defendants' Motion in Limine (Doc. # 65).

## I. BACKGROUND

Plaintiff began working for Capital Region Medical Center ("CRMC") in March 1993 as a Certified Mammography Technologist in CRMC's Mammography Unit. According to the job description, a Mammography Staff Technologist is required to perform mammography examinations according to departmental protocols, adhere to recommended safety standards, operate the radiographic equipment and perform radiographic procedures of the breast by selecting proper positioning and technical factors for each patient and exam, tend to the physical and psychological needs of all patients, evaluate images for technical quality, obtaining and/or completing all necessary registration, billing and medical record paperwork, provide assistance to physicians during procedures, provide assistance with positioning patients, controlling tube/table movement and specimen collection. This job description was effective on

May 1, 2001 and was reviewed on June 1, 2005.

Plaintiff was initially diagnosed with epilepsy in the 1970's. Her epilepsy is idiopathic, meaning it has no known cause. Plaintiff's epilepsy causes her to have sudden, unpredictable seizures. During her seizures, plaintiff will stop what she is doing and fall down. All of her muscles contract at once, which sometimes causes her to shake. She is not aware of her surroundings during a seizure. Plaintiff's first seizure occurred at CRMC in 2004 in the mammography office while she was working on a schedule. On August 1, 2007, plaintiff suffered another seizure while in the back office of the mammography room. Plaintiff fell, hit her head on the counter, bit her tongue and cheek. Between June 2008 and August 2010, plaintiff suffered fourteen seizures at CRMC. During some of these seizures, plaintiff hit her head on counters, suffered cuts to her head and tongue, injured her face and on one occasion appeared to stop breathing. On March 5 and July 13, 2010, plaintiff suffered a seizure while she was working with patients. One of the patients was being positioned in the machine when plaintiff had the seizure. In a report to CRMC the patient stated that plaintiff had just begun the compression portion of the mammogram when she fell to the floor. One of the patients complained to CRMC and stated that it was a patient safety issue and that she felt that she needed to report it so that "no one else having a mammo will have to go through what I just went through. Please make certain this safety issue will be taken care of." (Defendants' Exhibit 24).

Beginning in August 2008, following the seizures where plaintiff lost consciousness, injured herself and had her breathing interrupted, CRMC placed plaintiff on paid administrative leave until September 25, 2008 so that she could obtain an

2

opinion from a neurologist about the reasons for the increase in her seizures. After plaintiff submitted a letter from a neurologist on September 8, 2008, she returned to work.

In 2008, the Mammography unit was in a crisis situation because four technologists, including plaintiff had some uncertainty about the days that they were available to work or were on leave. An employee in the X-Ray unit, Lauren Carender, expressed an interest in working in the Mammography Unit. In order to help alleviate the staffing situation, CRMC hired Ms. Carender as a fifth technologist in August 2008, so that she could begin training and obtain the necessary experience. Ms. Carender became a full-time technologist in 2009.

From June 2008 to February 2010, CRMC made a number of accommodations in an effort to alleviate conditions which might be potential triggers for plaintiff's seizures. The accommodations included: removing and remediating mold in plaintiff's work areas, investigating the ingredients of products used to clean the mammography area and machines, having other technicians perform mammograms for patients who were wearing heavy perfume, installing anti-glare filters on lights in plaintiff's work room, adjusting the computers so that text would not scroll, having employees cover view boxes with x-ray film when not in use in order to reduce the brightness of the light, permitting plaintiff to wear sunglasses, educating fellow employees on epilepsy and how to treat persons suffering from a seizure.

On November 18, 2008, following a seizure where plaintiff hit her head and required three staples, CRMC decided that the risk of harm to plaintiff and others prevented her from performing the duties of a mammographer and decided to work with

her to find an alternative position. On November 19, 2008, CRMC placed plaintiff on paid administrative leave and advised that they would help plaintiff find an open position that did not involve patient care. When plaintiff's paid administrative leave expired on December 19, 2008, she was then placed on FMLA leave beginning on December 22, 2008. Plaintiff returned to work as a mammography technologist in March 2009, following CRMC's changes to her work environment. However, plaintiff's seizures continued. She had a seizure on April 20, 2009, May 18, 2009, October 15, 2009, November 20, 2009, March 5, 2010, June 21, 2010 and July 13, 2010. In July 2010, CRMC determined that the accommodations were not working and plaintiff's seizures posed a risk to herself and the patients and she could no longer work as a mammographer. On July 14, 2010, defendant Robert Mazur, Vice-President of Human Resources, notified plaintiff of CRMC's decision to place her on administrative leave and to attempt to find an alternative position for her. On July 29, 2010, Mr. Mazur responded to plaintiff's request that CRMC create a new position for her as a Breast Health Coordinator. He explained that the position required an individual who was a registered nurse. He also explained that this position was not created because the patient volume did not justify creation of the position. But, Mr. Mazur did offer plaintiff a position as a temporary file clerk in the Imagining Department. He explained that this was not a permanent solution, but rather was an opportunity for plaintiff to continue her employment, while they considered more permanent job opportunities. Plaintiff accepted the position and worked there until January 14, 2011, when the position expired. Plaintiff suffered two more seizures while working in the temporary position, one on August 4, 2010 and another on August 17, 2010. Following the expiration of the

4

temporary file clerk position, CRMC placed plaintiff on unpaid administrative leave with full benefits. From January 2011 through April 2011, CRMC continued to provide plaintiff with a current list of open positions at the hospital. On May 17, 2011, after being informed by plaintiff and her counsel that her seizures were under control as a result of a change in medications and that she had regained her driver's license, CRMC offered to reinstate plaintiff at her prior rate of pay and with full seniority and benefits. Plaintiff rejected this offer and on May 31, 2011, CRMC terminated plaintiff's employment. CRMC did not fill plaintiff's position after her discharge in May 2011. The Mammography department had only four technologists and their hours were reduced after plaintiff's discharge.

Plaintiff filed her first Charge of Discrimination with the Missouri Commission on Human Rights and the Equal Employment Opportunity Commission on August 10, 2009, alleging disability and age discrimination. Plaintiff claims that CRMC and defendant Mazur violated the Americans With Disabilities Act ("ADA"), Age Discrimination in Employment Act ("ADEA") and the Missouri Human Rights Act ("MHRA") by discriminating against her based on her disability and age and retaliating against her for filing her first charge of discrimination. In connection with her age discrimination claim plaintiff alleges that she was replaced by a younger employee, Ms. Carender and that plaintiff's supervisor, Carrie Fischer, left a note on April 20, 2009, inquiring if plaintiff desired to work full-time or part-time because she was "nearing retirement age."

## II. STANDARD

5

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986). In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

### III. DISCUSSION

#### A. Disability Discrimination - ADA/MHRA

As there is no direct evidence of discrimination, the Court will proceed to analyze plaintiff's claims of discrimination under the burden-shifting framework of McDonnell Douglas v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This framework requires plaintiff to first establish a prima facie case of discrimination. To

Case 2:10-cv-04221-FJG   Document 69   Filed 04/12/12   Page 6 of 22

establish a prima facie case of discrimination under the ADA, the plaintiff must show:

> 1) an ADA-qualifying disability; 2) qualifications to perform the essential functions of her position with or without reasonable accommodation; and 3) an adverse employment action due to her disability.

Shockley v. City of St. Louis, No. 4:10CV638 FRB, 2011 WL 4369394, *6 (E.D.Mo.

Sept. 19, 2011) citing Norman v. Union Pac. R.R.Co., 606 F.3d 455,459 (8th Cir. 2010).

In 2008, Congress enacted amendments to the ADA. "The amendments broadened the

definition of what constitutes a disability and rejected the strict standards the Supreme

Court set forth in Toyota [Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002)]."

Nyrop v. Independent Sch. Dist. No. 11, 616 F.3d 728, 734 n.4 (8th Cir.2010).

To establish a prima facie case of discrimination under the MHRA, a plaintiff

must show:

> (1) that the defendant engaged in some discriminatory act; (2) that the plaintiff's disability was a contributing factor for the defendant's actions; and (3) that as a direct result of defendant's conduct as alleged, the plaintiff suffered damages. Missouri Approved Jury Instr. (Civil) 31.24 (6th ed.). "[I]n order to be disabled under the MHRA, a person must have an impairment that limits a major life activity and with or without reasonable accommodation that impairment must not interfere with performing a job." Medley v. Valentine Radford Commc'ns, 173 S.W.3d 315, 320 (Mo.Ct.App.2005).

Hanlon v. Missouri Dept. of Health & Human Services, 2:10-CV-04267, 2012 WL

528316, *4 (W.D.Mo. Feb. 17, 2012).

In the instant case, the defendants do not dispute that plaintiff's epilepsy qualifies

as a disability. Rather, defendants argue that plaintiff cannot show that she was

qualified individual under either the ADA or the MHRA. Defendants also argue that they

are entitled to summary judgment based on the direct threat affirmative defense.

7

**1. Is Plaintiff "Qualified" to Perform the Essential Functions of a Mammography Technologist?**

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n). In determining the essential functions, the ADA states that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). "Plaintiffs are only required to make a facial showing that reasonable accommodation is possible. . . . Once Plaintiffs have demonstrated the existence of an accommodation that seems reasonable on its face . . .the burden of production shifts to [defendant] to show that it is unable to accommodate." EEOC v. Hibbing Taconite Co., 720 F.Supp.2d 1073, 1079-80 (D.Minn. 2010)(internal citations and quotations omitted).

In the instant case, the parties do not dispute the essential functions of a mammographer technologist. Plaintiff argues that she was fully capable of performing the essential functions of her job and the only accommodation she required was intermittent leave to rest and recuperate following a seizure. Plaintiff states that defendants granted her that accommodation and she was performing her job "very well." Plaintiff also states in her suggestions in opposition that "the record is devoid of

8

any evidence that [she] could not perform all functions required of a mammography technologist at any other time **except** when she was actually experiencing a seizure or recovering therefrom." (Plaintiff's Suggestions in Opposition, p. 16)(emphasis added). Thus, plaintiff in essence admits that she could not perform the essential functions of her position when she was having a seizure and for some unspecified period of time afterwards. Plaintiff cites to EEOC v. Kinney Shoe Corp., 917 F.Supp. 419, 427 (W.D.Va. 1996), aff'd by, Martinson v. Kinney Shoe Corp., 104 F.3d 683 (4th Cir. 1997), in support of her position that she was qualified to perform the essential functions of her position, even though she experienced seizures during her workday. However, in that case, the plaintiff was a shoe salesman. The Court stated that "the factfinder must examine the specific facts of each case to determine if temporary incapacitation renders an individual unqualified for the position at issue." Id. at 427. The Court distinguished the position of a shoe salesman from that of a nurse, stating: "a nurse is charged with caring for patients, a task which if compromised, can leave other individuals in difficult straits. A shoe salesman, in contrast, is charged with selling shoes, a task which if compromised, simply leaves customers without shoes for a brief period." In other cases, courts have found that individuals suffering seizures cannot perform the essential functions of their jobs. In McFarland-Peebles v. Virginia Dept. of Motor Vehicles, 352 Fed.Appx. 848 (4th Cir. 2009), the plaintiff suffered a dozen epileptic seizures over the period of four years. The Court noted that although her seizures were initially controlled with medication, the seizures were becoming more frequent and severe over time. The Court found that "[s]uch frequent seizures would significantly interfere with, if not negate, her ability to perform the essential functions of her job." Id.

9

at 849.  As a result, the Fourth Circuit found that the district court had properly granted summary judgment because plaintiff had failed to establish a prima facie case. Similarly, in <u>Gault v. University of Chicago Hospitals</u>, No. 90 C 0321, 1991 WL 38757 (N.D.Ill Mar. 19, 1991), the plaintiff who was a nurse suffered from epilepsy and experienced unpredictable seizures.  Plaintiff worked in a burn unit and suffered a seizure while she was using scissors to change a dressing, once while serving as a charge nurse, another time while assisting in the suctioning of a patient's breathing apparatus resulting in extubation of the patient and another time while cutting a dressing, causing a patient to leave his room to seek help.  The Court concluded that "Gault cannot contend that she was meeting her position requirements."  <u>Id</u>. at *1. In the instant case the Court does not find that plaintiff was performing the essential functions of her position due to her uncontrolled and unpredictable seizures which occurred between June 2008 and August 2010.

Plaintiff also argues that she was able to perform the essential functions of her position with an accommodation.  After she suffered a seizure, plaintiff would go home for the day and would usually take the next day off as well.  Plaintiff argues that this intermittent leave was a reasonable accommodation and allowed her to perform the essential functions of her position.  In reply, defendants argue that due to "the unique and patient-care related functions of Plaintiff's position, her seizures precluded her from performing those and other essential duties, and no accommodation from CRMC alleviated, or would have alleviated, the issue because the cause of her uncontrolled seizures was ineffective medication."  (Defendants' Reply Suggestions, p. 15).  The Court agrees and finds that due to the unique requirements of plaintiff's position, it was

10

not possible for her to carry out the essential functions of her position, during the time that she was having a seizure. Plaintiffs' arguments regarding intermittent leave really address the time period after the seizure was over, when plaintiff needed to recover. Therefore, the Court finds that plaintiff was not a qualified individual under the ADA or the MHRA because she could not perform the essential functions of her position while she was experiencing an uncontrolled and unpredictable seizure.

### 2. Did Plaintiff's Seizures Constitute a "Direct Threat"?

Even if the Court had found the plaintiff could perform the essential functions of her position, the Court finds that defendant would be entitled to summary judgment because plaintiff's seizures posed a direct threat to the health and safety of herself and others. The ADA includes a section on qualification standards. That section states in part:

> The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

42 U.S.C. § 12113( b).

Under the MHRA, defendants must show a threat of "demonstrable serious harm" to the employee or others. 8 C.S.R. § 60-3.060(1)(F)2-3.

The EEOC regulations implementing this provision define direct threat as:

> a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. . . .The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safety perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available

11

objective evidence.  In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;
(2) The nature and severity of the potential harm;
(3) The likelihood that the potential harm will occur; and
(4) The imminence of the potential harm.

Courts generally have held that the existence of a direct threat is a defense to be proved by the employer. . . .We have recognized an exception to the general rule: [W]here the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that she can perform those functions without endangering others.

Jarvis v. Potter, 500 F.3d 1113, 1122 (10th Cir.2007)(internal citations and quotations omitted).

Defendants argue that courts have found seizure related disabilities to constitute a direct threat to the employee and others. Defendants also argue that in the instant case, plaintiff suffered fifteen seizures over the course of a three year time period. During this time, plaintiff suffered numerous injuries to herself, including cuts and abrasions, bites to her tongue and cheek and on one occasion an interruption of her breathing. Additionally, defendant notes that on two separate occasions in March and July 2010, plaintiff suffered seizures while she was conducting mammogram examinations on patients.  In July 2010, plaintiff had a seizure while the patient was in the mammography machine in the early stages of the compression of her breast.

In examining the factors identified above, plaintiff's epilepsy was something which she had been diagnosed with several years ago.  Although plaintiff had previously been able to control her seizures, from June 2008 through August 2010, plaintiff experienced a total of fourteen seizures in this two year period.  Additionally, with regard to the duration factor, plaintiff's seizures lasted long enough to cause her to lose

consciousness for a period of several minutes. As to the nature and severity of the potential harm, as previously discussed, plaintiff's seizures resulted in fairly significant injuries to herself, such as a cut on her head which required three staples to close, an interruption in her breathing when she became lodged in between some furniture in the mammography room, and other abrasions and cuts to her hand and face. Regarding the likelihood of the potential harm, the Court finds that the occurrence of fourteen seizures over a two year time frame is evidence that the seizures and plaintiff's resulting injuries would continue to occur. The Court also finds that the danger that plaintiff would lose consciousness and fall and either injure herself or a patient she was performing an examination on was imminent, as this had occurred fourteen times over a two year period of time and no accommodations which defendants had instituted in plaintiff's work area seemed to alleviate the seizures. Thus, the imminence of the potential harm was significant.

Plaintiff argues that the defendants cannot prevail on their direct threat defense because they were operating in a vacuum, they failed to perform any objective or rational analysis of the safety risks to plaintiff or her patients and instead relied on their own subjective beliefs and conjecture. Plaintiff argues that Robert Mazur envisioned that Andrea could "collapse on top of a patient." Plaintiff argues however that Mr. Mazur nor anyone else at CRMC consulted with any health care provider to determine what sort of injury a patient might incur if she were trapped in the mammography machine. But, the defendants did not have to consult any health care providers to determine what sort of injuries might occur, because on two separate occasions, plaintiff was conducting an mammography examination on patients when she suffered a seizure.

13

Although both patients were very upset by the occurrence, neither suffered any physical injuries. However, as the Court noted in Mayes v. Whitlock Packaging Corp., No. 09-CV-278-JHP, 2010 WL 1754200, *5 (E.D.Okla. Apr. 29, 2010),"[t]he law does not require [defendant] to wait for a serious injury before eliminating such a threat." In the instant case, it is not hard to imagine what harm a patient could potentially suffer if the mammography machine was in full compression and plaintiff experienced a seizure or if plaintiff were to fall on a patient while she was positioning them in the machine. Plaintiff argues that there was a safety release button which patients could push to release the compression of the machine. However, even if this were true, it has not been shown that the button was easily reachable by all patients. Additionally, this would not have prevented the risk that plaintiff would fall onto or cause a patient to fall during an examination.

Plaintiff also argues that defendant's alleged concerns about the plaintiff's safety were insincere because they failed to conduct any safety analysis of the temporary file clerk position that she was offered. Plaintiff states that no one consulted a physician to determine whether the file room was a safer environment for plaintiff. However, it is clear from Mr. Mazur's letter to plaintiff that the file clerk position was only a temporary position, until they could find a more permanent position for plaintiff. Mr. Mazur stated: "I would like to offer you the opportunity to return and assist in the completion of that project [transitioning of files in the Radiology Department], not as a permanent solution to this situation, but rather as an opportunity to continue your employment while we consider other more permanent job opportunities." (Defendant's Ex. 39). Additionally, the evidence established that the defendants believed this position would place plaintiff

14

in a controlled environment and would involve more sitting, so that if she did suffer a

seizure, the risk of injury would be reduced.  Plaintiff did in fact suffer two seizures while

working in the file room, but neither caused severe injuries to plaintiff.

After analysis of the factors discussed above, the Court finds that defendant has

shown that plaintiff posed a direct threat to both herself and others.  As the Court stated

in Wurzel v. Whirlpool Corp., No. 3:09CV498, 2010 WL 1495197, *9 (N.D.Ohio Apr. 14,

2010), "[t]he ADA prohibits discrimination based on sterotypes (i.e. adverse action

simply on the basis of the person's disabling, or perceived disabling condition). The Act

does not, however, bar acting when that condition leads to harm or risk of harm."  The

Court finds that defendants' actions were not motivated by discrimination based on

plaintiff's epilepsy, but rather were in response to the unpredictable and severe

consequences caused by plaintiff's seizures. Because plaintiff posed a direct threat to

herself and to others, plaintiff was not a qualified individual under either the ADA or the

MHRA. Therefore, because plaintiff has not met the requirements of a prima facie case,

the Court hereby **GRANTS** defendant's Motion for Summary Judgment on plaintiff's

disability discrimination claim under the ADA and the MHRA.

### B. Age Discrimination - ADEA/MHRA

In order to establish a prima facie case of age discrimination, plaintiff must

establish:

(1) [s]he is over forty; (2) [s]he was qualified for the position; (3) [s]he
suffered an adverse employment action; and (4) similarly-situated
employees outside the class were treated more favorably.

Anderson v. Durham D & M, L.L.C., 606 F.3d 513,523 (8th Cir.2010). "The Eighth Circuit

Court of Appeals has 'frequently stated that the last prong of the prima facie case is established by demonstrating the plaintiff was replaced by a substantially younger individual." Hastings v. Papillion-LaVista School Dist., 780 F.Supp.2d 958, 962-63 (D.Neb. Jan. 25, 2011), citing McGinnis v. Union Pac.R.R., 496 F.3d 868, 875-76 (8th Cir.2007). In Clark v. Matthews International Corp., 639 F.3d 391, 398 (8th Cir. 2011), the Eighth Circuit stated:

> The MHRA and the ADEA are worded similarly. Both statutes generally prohibit employers from discriminating against their employees "because of" their age. 29 U.S.C. § 623(a)(1); Mo. Ann. Stat. § 213.055(1). Under the ADEA, the United States Supreme Court has stated that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." Gross v. FBL Fin. Servs., Inc., ⸺ U.S. ⸺, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009). Under the ADEA, "therefore, a plaintiff must prove that age was the 'but for' cause of the employer's adverse decision." Id. In our prior opinion, we explained that this meant that Clark had to "show that if it were not for his age, he would not have been terminated and he would have become a primary-packaging designer." Clark, 628 F.3d at 469. Under the MHRA, however, Clark is not required to prove that age was the "but for" cause of Matthews's adverse employment actions. According to the Supreme Court of Missouri, "[n]othing in [the] statutory language of the MHRA requires a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision; if consideration of age ... contributed to the unfair treatment, that is sufficient." Daugherty v. City of Md. Heights, 231 S.W.3d 814, 819 (Mo.2007).

Id.. at 398.

Plaintiff argues that defendant hired Lauren Carender as a mammography technician in September 2008 and that Ms. Carender's start date coincided with the first instance in which plaintiff was forced to take leave from her job. Additionally, plaintiff states that on April 20, 2009, plaintiff's supervisor left a note for plaintiff asking if she intended to continue working full-time or if she wanted to work part-time as she was

16

"nearing retirement age." Plaintiff argues that defendant's intent in hiring Ms. Carender, was to replace plaintiff with a younger, less qualified worker.

Defendants argue that plaintiff cannot show that she was qualified for the position, because her seizures were debilitating and were increasing in frequency between 2008 to 2010. Additionally, defendants argue that Ms. Carender did not replace plaintiff. Rather, Ms. Carender was hired because there was a need for more mammographers in the department and Ms. Carender had expressed an interest in becoming certified in mammography. The evidence shows that no one was hired to replace plaintiff. Rather, Ms. Carender worked alongside plaintiff in the mammography department with plaintiff from 2008 until 2011. When plaintiff was discharged, only four technologists remained and CRMC did not hire anyone to replace plaintiff's position.

Plaintiff argues that there is a question of fact regarding the issue of whether she was replaced by a younger individual. Plaintiff points to the fact that when she was first hired, Ms. Carender was in training and that after she completed her training was around the same time that plaintiff left the department. Plaintiff also points to a note left on plaintiff's work area asking if she wanted to continue to work full-time as she reached "retirement age" as evidence of discriminatory intent.

The Court disagrees. The supervisor of the imaging department stated that in the summer of 2008, the mammography unit was in a "crisis mode" because four technologists, including plaintiff were taking some type of leave or had some uncertainty about their availability to work. Ms. Carender, an employee in the X-Ray department expressed an interest in working in the Mammography unit. In order to become a certified mammography technologist, an individual must be trained and complete a

17

number of mammography examinations. In order to assist with getting Ms. Carender trained, CRMC hired Ms. Carender in August 2008, so that she could begin the training and obtain the necessary hands-on experience. Ms. Carender became a full-time Mammography Technologist in 2009. Plaintiff first took paid administrative leave from August 2008 until September 25, 2008. Plaintiff was again placed on paid administrative leave beginning on November 19, 2008 until December 19, 2008. Plaintiff was then placed on FMLA leave beginning on December 22, 2008 until March 2009. Plaintiff then returned to work in March 2009. Plaintiff was not placed on administrative leave again until July 14, 2010. Thus, this timing demonstrates that plaintiff's position was not replaced by Ms. Carender. Rather, Ms. Carender was hired to assist with the department's need for additional technologists, during a busy time. Additionally, the Court also does not find that the note left by plaintiff's supervisor is evidence of pretext. In Rivers-Frison v. Southeast Mo. Community Treatment Center, 133 F.3d 616 (8th Cir.1998), the Court stated:

> [N]ot every prejudiced remark made at work supports an inference of illegal employment discrimination. We have carefully distinguished between comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.

Id. at 619 (internal citations omitted). In the instant case, the Court finds that the note left by plaintiff's supervisor was simply an inquiry about the hours plaintiff wished to work and is not indicative of any type of age related animus.

Accordingly, the Court finds that plaintiff cannot meet the elements of a prima facie case of age discrimination because she cannot demonstrate that she was qualified

18

for the position nor that she was replaced by a younger individual. Accordingly, the

Court hereby **GRANTS** defendant's Motion for Summary Judgment on plaintiff's ADEA

Claim and her age discrimination claim under the MHRA.

### C. Retaliation

To establish a prima facie case of retaliation under the ADA, plaintiff must show:

1) that she engaged in protected conduct, 2) that reasonable employees
would have found the challenged retaliatory action materially adverse, and
3) that the materially adverse action was causally linked to the protected
conduct.

Weger v. City of Ladue, 500 F.3d 710, 726 (8th Cir. 2007).

Plaintiff states that defendants informed her that they intended to terminate her

from her position in the mammography department on July 14, 2010. The letter from

Mr. Mazur stated that plaintiff would be placed on paid administrative leave for the

purpose of exploring other job opportunities that did not involve patient contact and

would provide a safer environment. The letter stated that if no alternative position was

identified by July 28, 2010, it would be necessary to end plaintiff's employment. Plaintiff

states that the EEOC issued it Notice of Right to Sue on plaintiff's initial charge of

discrimination on July 13, 2010. Plaintiff argues that defendants' conduct in placing her

on leave and threatening to terminate her was in retaliation for her previous complaints

of disability and age discrimination.

Defendants argues that plaintiff filed her charge of discrimination on August 10,

2009, which was eleven months before Mr. Mazur's July 14, 2010 letter. Defendants

argue that the issuance of the Notice of Right to Sue letter one day before she was

placed on administrative leave is purely coincidental. The Right to Sue letter is a

19

ministerial act by a government agency and is not protected activity by the plaintiff. Additionally, defendants argue that there is no evidence that CRMC even received the letter or had reviewed it when it placed plaintiff on administrative leave. Rather, defendants argue that the decision to place plaintiff on administrative leave was instead prompted by a seizure that she had suffered the day before while a patient was in the mammography machine.

Plaintiff argues that she first engaged in protected activity on January 5, 2009, when her attorney sent a letter to the hospital's president. Plaintiff states that she was returned to work, but continued to demand restoration of her sick leave and unpaid wages for the periods when she was placed on involuntary leave. Plaintiff filed a charge of discrimination on August 10, 2009, complaining of disability and age discrimination. Plaintiff claims that all of these actions constitute protected activity. Plaintiff argues that she was removed from the mammography unit on July 14, 2010, which was the day after she suffered a seizure in the presence of a patient and was also the day after the EEOC issued its Notice of Right to Sue letter.

The defendant argues that there is no temporal proximity, because the protected conduct occurred in 2009[1], but plaintiff was not removed from the Mammography Unit until July 2010. Courts have noted that "any inference of causal connection is substantially weakened by the length of time, more than a year, between the allegedly protected activity and the supposedly retaliatory conduct." Moore v. Lehigh Cement

---

[1] The three instances of protected activity plaintiff alleges are: 1) a January 5, 2009 letter from her counsel complaining of disability discrimination; 2) a June 3, 2009 letter from her counsel demanding restoration of sick leave and 3) August 10, 2009 charge of discrimination.

20

Co., No. C 09-3066-MWB, 2011 WL 454499, *15 (N.D.Iowa Feb. 4, 2011).  In Shanklin v. Fitzgerald, 397 F.3d 596, 604 (8th Cir.), cert. denied, 546 U.S.1066, 126 S.Ct. 807, 163 L.Ed.2d 636 (2005) the Court noted that "[t]en months elapsed between the date Shanklin filed her EEOC charge and the date the Board discharged Shanklin.  With this lengthy delay, any causal nexus inference tends to evaporate."  In the instant case, plaintiff filed her charge of discrimination on August 10, 2009, but she was not removed from the Mammography Unit until eleven months later in July 2010.   Additionally, defendant notes that the issuance of a right to sue letter is not protected activity and cannot show the required nexus.  In Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273,121 S.Ct.1508,149 L.Ed.2d 509 (2001), the Court stated it is an "utterly implausible suggestion that the EEOC's issuance of a right-to-sue letter - an action in which the employee takes no part - is a protected activity."   The Court agrees and finds that there is no causal connection between plaintiff's protected activity in 2009 and her removal from the Mammography Unit in July 2010.  Accordingly, the Court finds that plaintiff has failed to establish a prima facie case of retaliation.  Therefore, the Court hereby **GRANTS** defendants' Motion for Summary Judgment on Plaintiff's Retaliation claim.

### D.  Claims Against Robert Mazur

Plaintiff has named Mazur, CRMC's Human Resources Director, as an individual defendant under all of her claims.  However, individual supervisors or co-workers cannot be held liable under the ADA or the ADEA.  In Ebersole v. Novo Nordisk, Inc., No. 1:11CV25 SNLJ, 2011 WL 6115655 (E.D.Mo. Dec. 8, 2011), the Court stated:

> in Alsbrook v. City of Maumelle, the Eighth Circuit held that Title II of the ADA does not permit individual liability, and that Court then observed that,

with respect to Title I (the Title at issue here), "three [Circuits] have held that there is no liability under Title I against individuals who do not otherwise qualify as 'employers' under the statutory definition." 184 F.3d 999, 1005 n. 8 (8th Cir.1999).

Id. at *1. Additionally, the Court stated that "this Court has repeatedly held that individuals are not liable under the ADA." Id. The Court continued, "[i]t is well-settled in the Eighth Circuit that individuals are not subject to individual liability under Title VII of the Civil Rights Act of 1964, and longstanding precedent in this Court also holds that individuals are not liable under the ADEA." Id.

Defendants noted that individual liability does exist under the MHRA. However, they argue that plaintiff must satisfy every element for her claims against Mr. Mazur - thus showing that her disability, age or protected activity was a contributing factor in some action or decision by him. As stated above, because plaintiff cannot meet the prima facie elements of a disability, age or retaliation claim, her individual claims against Mr. Mazur fail as well. Accordingly, defendants' Motion for Summary Judgment as to the individual claims against Mr. Mazur are hereby **GRANTED**.

## IV. CONCLUSION

For the reasons stated above, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment (Doc. # 30) and **DENIES** as **MOOT** Plaintiff's Motion in Limine (Doc. # 64) and defendants' Motion in Limine (Doc. # 65).


Date: April 12, 2012                         **S/ FERNANDO J. GAITAN**, **JR.**
Kansas City, Missouri                    Fernando J. Gaitan, Jr.
                                                        Chief United States District Judge

Case 2:10-cv-04221-FJG   Document 69   Filed 04/12/12   Page 22 of 22